## SAMUEL D. PORTER

*v.*

## JAMES MCNABNEY *et al.*

1. DEED OF TRUST—*title under forged assignment after satisfaction.* Where the parties in interest to a deed of trust on land, given to secure the purchase money, cancelled the notes and deed of trust, and wrote across the face of the deed "cancelled in full," when it was returned to the grantor in such deed, who thereupon reconveyed the land purchased by him to the original owner, and the latter procured a release from the trustee, in whom was the legal title, of all his interest in the land, and sold the same to a *bona fide* purchaser, and the trustee, about the same time, having in his possession a copy of such deed of trust, and copies of the notes, which were forged, with a forged assignment thereof, transferred the same to a third party for value, who caused the trust deed to be foreclosed by a sale, and became the purchaser: *Held*, on bills to remove clouds from the title of the respective parties, that the purchaser under the trust deed, it and the notes held by him being forged, acquired no title to the land under the trustee's sale that could prevail against the grantee of the original owner.

2. RECORDING LAW—*when purchaser protected by facts appearing from record.* Where the record of deeds showed that a party giving a deed of trust to secure the purchase money, had reconveyed the land to the former owner and his grantor, and a release of the land by the trustee, a purchaser from the former owner, in whom the record showed title, will not be bound to examine the records further to see if a conveyance had been made subsequently to such release, by any party authorized to sell under the trust deed, as the record showed the revocation of the power of sale, and such purchaser will be protected against any sale under the deed of trust.

3. DEED OF TRUST—*sale under power after release.* After the trustee in a deed of trust has released his power of sale by a formal deed of release, the party named as his successor, to exercise the power in case of his death or absence, will have no more authority to make a sale of the land conveyed by the trust deed than a mere stranger; and where such release is recorded before such a sale, a purchaser of the land from the owner will not be bound to search the record of deeds to see if a conveyance has been made under the power after its release.

APPEAL from the Circuit Court of St. Clair county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

This was a bill in chancery, filed by James McNabney, James Hood and Robert Hood, against Samuel D. Porter, Philip C. Taylor and Alexander M. Wilson, to remove a cloud from the title to a certain half section of land claimed by the complainants. The defendants Porter and Taylor, after answering the bill, filed their cross-bill, making McNabney, the Hoods, Wilson, Murray A. Carter and Julian Carter defendants, to have the complainants' claim set aside as a cloud on their title. The material facts are substantially stated in the opinion of the court.

Mr. JAMES M. DILL, for the appellant.

Mr. WM. H. UNDERWOOD, for the appellees.

Mr. JUSTICE SCOTT delivered the opinion of the Court :

The contestants each claim the land involved in this litigation, in fee simple, and each party is seeking to have the title of the other set aside as a cloud upon his own title.

The land originally belonged to James McNabney, he having purchased it from the government. On the 19th day of July, 1870, he conveyed it to Alexander M. Wilson. Afterwards, on the 27th day of that month, Wilson, his wife joining with him, conveyed the land to Murray A. Carter. On the same day, Murray A. Carter made a deed of trust on it to his brother, Julian Carter, to secure to Wilson $4000, evidenced by a promissory note of even date, payable to the order of Wilson three years after date, and six small notes for the semi-annual interest thereon, which deed of trust was conditioned for the payment of the several notes as they became due, and the taxes on the real estate. On condition broken, it was provided the trustee named should make sale of the land at the east front door of the court house in the city of St. Louis, and in case of the death or absence of the trustee, the sheriff of St. Louis county should make the sale, after giving the prescribed notice.

The deed of trust was recorded in the proper office in Alexander county, where the land is situated, on the 2d day of August, 1870, as appears by the file mark on the back of the original deed. All the other conveyances were recorded in the proper office.

It is claimed that Murray A. Carter and Wilson, by their mutual agreement, on the 13th day of October, 1870, cancelled the notes and deed of trust, and then wrote across the face of the deed the words "cancelled in full;" that it was then returned to Murray A. Carter, who thereupon reconveyed the premises to Wilson, which deed was recorded in Alexander county, on the 14th day of October, 1870. Afterwards, on the 30th day of November following, it is alleged Wilson, in order to perfect his title of record, procured from Julian Carter a deed of release of all his title to the lands under the deed of trust, which latter deed was filed in the proper office on the 5th day of December thereafter. On the 16th day of September, 1871, Wilson and his wife, by deed containing full covenants of warranty, conveyed the premises to appellees.

The bill charges that Porter surreptitiously obtained possession of the deed of trust, after it had been cancelled by the parties in interest, and notes secured by it, with the forged indorsement of Wilson upon them, and, pretending to be the legal owner, and to have the right to have the land sold under the provisions of the deed of trust, to satisfy the indebtedness secured thereby, procured the sheriff of St. Louis county to advertise and sell the land. At that sale Porter became the purchaser of the property, and on the 8th of June, 1871, he received a trustee's deed from the sheriff of St. Louis county, which purports to convey to him the land under the power contained in the deed of trust. This deed was also recorded in the proper office in Alexander county, and it is charged to be a cloud on the title of appellees' land.

The defense is, that, in September, 1870, Julian Carter came to Porter, having in his possession the several notes, with Wilson's indorsement thereon, and the deed of trust by

which they were secured, and, representing he was the owner, applied to him for a loan, and that Porter loaned him $1420, to be repaid in thirty. days, with interest, and to secure the payment, Julian Carter then delivered to him the notes and deed of trust, to be held by him as security, upon the express understanding, if default should be made in the payment of the money loaned, Porter should be the absolute owner of the securities.

Julian Carter failed to pay his indebtedness to Porter, and Murray Carter having made default in the payment of the notes secured by the deed of trust, Porter, in the absence of Julian Carter, the trustee, who had then left the State, procured the sheriff of St. Louis county to sell the property under the power contained in the deed of trust, at which sale Porter purchased the property. It is the title thus acquired under the trustee's sale that Porter now insists is the better title. In the cross-bill filed by Porter, it is charged the conveyance made by Murray Carter to Wilson on the 13th day of October, 1870, and the deed of release made by Julian Carter with a view to aid Wilson's title, were made in fraud of his rights, and are a cloud upon his title.

The testimony given on the trial is singularly conflicting, and presents a curious state of facts. Wilson and Porter are the principal witnesses in the case, and while there is great conflict in their testimony, there is nothing introduced into the record that impeaches the character of either of them.

Whether the notes were ever indorsed by Wilson, and who in fact had possession of the original deed of trust, are questions to which the evidence affords no satisfactory answers.

Wilson positively denies he ever indorsed the notes. According to his testimony, he first heard, about the 8th of October, 1870, that Porter claimed to have the notes in his possession, with his indorsement upon them. He went to the office of Porter and demanded to see the notes, and, on their production, told Porter it was not his indorsement. Lacy corroborates Wilson in this statement. In addition to the

direct notice, he gave notice by publication in a public newspaper, that the notes in Porter's hands had been procured from him without consideration, and that he had never indorsed them.

There is no evidence in the record that the indorsement on the back of the notes was in the handwriting of Wilson. There is some testimony, however, tending to show he admitted he had indorsed the notes, but it is not of a satisfactory character.

As to the custody of the deed of trust, Wilson states most positively he had it in his possession in the month of October, 1870, when he made the cancellation on the face of it. He says he then gave it up to Murray Carter, the maker of the deed. On the other hand, Porter is equally as positive in his statement, that after he first received the deed of trust, in August, 1870, it remained all the time in his possession until about the 10th or 11th of April, 1871. He assigns as a reason why Wilson could not have had it in October, 1870, that it was locked up in the sub-treasury of his safe. The only person, besides himself, that had access to the safe, was Hill, his business partner, who was produced as a witness, and testified it was in the safe.

In March, 1871, Porter requested Julian Carter to sell the property under the deed of trust, which he did. Porter became a purchaser at that sale, and the trustee made him a deed of the property. Julian Carter was going to Alexander county, and proposed to take the deed with him and have it recorded, to which proposition Porter assented, and gave him the money to pay the recording fees. He also proposed to take the deed of trust, saying he would return it with the other deed when it should be recorded. Porter gave it to him. This was the last that was ever heard of either of the deeds. Carter never left the deed for record, and neither returned it nor the deed of trust, so far as this evidence shows. It was in consequence of this breach of faith on the part of Julian Carter that Porter afterwards procured Taylor, the

sheriff of St. Louis county, to make another sale of the property.

What seems to be conceded by both parties to be the original deed of trust, is certified to this court with the record. It was produced on the trial by Porter. After the second sale, he says Murray Carter handed to him the old deed of trust. He opened it, and asked him who had been scribbling on it. Carter, in reply, said it had been laying on his table, and some parties had been figuring on it, and he saw it, and brought it around to him. He further said, there was some writing on it, and that he had used a preparation to take it off, but that the writing did not amount to anything.

On inspection, we discover no writing on the deed other than the file mark on the back, except on the face, where Wilson says he wrote the words "cancelled in full." Evidently an attempt had been made by some one to efface what had been written there, but a part of it is still distinctly legible. We can read "Oct. 13, 1870," distinctly, and then follows another word badly defaced, but it appears to be either "cancelled" or "satisfied" "in full." Before "A. Carter," some letter or word has been erased, but we can not detect what it was.

It is not shown that Wilson ever had the original deed in his possession after he gave it up to Murray Carter, or that he had any opportunity to do the writing upon it after that time. If this writing was mere scribbling, casually done by some one in Murray Carter's office, it is a singular coincidence that it contains some of the words, the exact date, on the face of the deed, that Wilson says he wrote on the 13th day of October, 1870. What purpose could Murray Carter have had in view in using a preparation to remove the writing, if it were accidental scribbling?

That Porter had a deed in his office that purported to be the original deed of trust, there is no reason to doubt. It is positively sworn to by him, and we have no reason to reject his testimony. It appears to have been honestly given, and so

far as we can know, he is a man of character.    But can it be possible it is the deed found in the record?

The deed Porter had in his safe so long, he gave to Julian Carter when he went to Alexander county, and unless the deed exhibited is the one, it has never been seen since. The one in evidence, which is undoubtedly the original deed, came to the possession of Porter from Murray Carter, to whom Wilson says he surrendered it when they cancelled it.    There is nothing in all the evidence that shows the deed of trust Murray Carter gave back to Porter with the scribbling upon it, was the one he had intrusted to the care of Julian Carter, to take with him to Alexander county.

It is said Murray and Julian Carter, when last heard from, were in Texas.    Their testimony would seem to be all important in this case, but it has not been taken by either party.

The contemporaneous circumstances in proof may throw some light upon this transaction.    The witness Hewett says Julian Carter could write several different kinds of writing, and that he forged a note on him for $100.    Wilson says Julian Carter bore a good reputation up to July, 1870, but that his reputation began to wane very fast from that time. The only way this testimony can be reconciled without imputing perjury to some of the witnesses, which we have no purpose to do, is upon the hypothesis that the deed of trust Porter had in his office so long was spurious, and that when it was intrusted to Julian Carter it was spirited away.    What design had he, and for what purpose could he have desired to take the deed of trust with him to Alexander county?    It had no connection with the business in hand, and if there was no history connected with it which it was desirable to conceal, there could be no reason why he did not return it to Porter.

Rather than believe any of the testimony given in this case was deliberately and corruptly false, we would prefer to adopt the conclusion there must have been two sets of notes as well as duplicate deeds.

16—77th Ill.

Wilson is positive he destroyed one set at the time he made the cancellation on the face of the deed, and they had not been indorsed. Another set is now produced by Porter with what purports to be Wilson's indorsement upon them.

Who practiced the fraud upon Porter, we have now no means of knowing, other than from mere conjecture. It is clear appellees had no connection with it, and are in no way responsible for it.

On the hypothesis the notes or the indorsements thereon, and the deed of trust in the hands of Porter, were forgeries, he could acquire no title to the property under the trustee's sale that could prevail against the title of the grantees of Wilson, who purchased in good faith for a valuable consideration.

But there is another view of the case which, we think, can be maintained. In the condition the record is shown to be, appellees, with great justice, could be regarded as innocent purchasers, for value, and hence entitled to protection.

On examination of the record, it would be discovered the premises had been reconveyed to Wilson by Murray A. Carter, the grantor in the deed of trust, and a release of the legal title had been given by Julian Carter, the trustee in whom it had been in trust for the parties interested. What reason can there be why the purchasers might not presume the conveyance and the release had been rightfully made? Clearly, they were under no obligation to examine the records further, to ascertain whether the trustee had made any subsequent conveyance of the property.

There was absolutely nothing on the record that disclosed to the purchasers the fact Porter claimed any interest in the property, save the deed from Taylor, the sheriff of St. Louis county, who assumed to be exercising a power derived from the deed of trust. Conceding they were bound to take notice of a deed made by one apparently a stranger to the title, still they would hardly be expected to search the record for the execution of a power which the record showed had previously been revoked. The trustee having released his power con-

tained in the deed of trust, what authority had the sheriff of St. Louis county, as his successor in the trust, to make sale of the property? While that release remained in force, it is plain no authority existed in the successor in the trust to make any sale of the property, and his deed was no more effectual to pass the title than would be the deed of a mere stranger. Whatever rights Porter may have had in the lands embraced in the deed of trust, he ought to have asserted in the courts of this State, where the lands are situated, before the rights of *bona fide* purchasers intervened. He had notice in apt time of all the principal facts, but he has lain by until superior equities have arisen which must prevail.

The decree of the circuit court will be affirmed.

*Decree affirmed.*